UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. S1-4:07CR00184 ERW (AGF) |
| GREGORY GRIGGS and | ) | |
| BRIAN COLLINS, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the pretrial motions filed by Defendants

Gregory Griggs and Brian Collins. Pretrial matters were referred to the undersigned

United States Magistrate Judge under 28 U.S.C. § 636(b). Trial is scheduled for October

29, 2007, before the Honorable E. Richard Webber.

Defendants Gregory Griggs and Brian Collins are two of twenty defendants named

in the indictment. Pretrial proceedings, including motion hearings, were held with regard

to various Defendants' motions on different dates. Defendant Gregory Griggs filed a

Motion to Suppress the Contents of any Electronic Surveillance (Doc. # 240), a Motion to

Sever (Doc. #241) as well as two discovery motions (Doc. Nos. 241 & 242). Defendant

Brian Collins filed four discovery motions (Doc. Nos. 245, 246, 247 and 249).[1]

---

[1] Defendant Collins filed a motion to suppress electronic surveillance (Doc. # 250), which motion he withdrew. Defendant Collins also filed a Request for Disclosure of Expert Testimony (Doc. #248). This document was filed as a request, and not as a

Defendant Griggs advised the Court that no hearing was necessary with regard to either his motion to sever or his discovery motions, and that the Court could determine such motions on the parties' written submissions. Defendant Collins made the same representation with regard to his discovery motions.

A consolidated evidentiary hearing with regard to various Defendants' motions to suppress electronic surveillance evidence was held on August 21, 2007. At the hearing, Defendant Collins withdrew his motion to suppress electronic surveillance evidence. Other than Defendant Griggs, all Defendants who originally filed motions to suppress electronic evidence also either waived and withdrew said motions prior to the hearing, or withdrew their motions following the hearing. The motion of Defendant Griggs, therefore, is the sole motion to suppress electronic surveillance still asserted in the case. At the hearing, the government was represented by Assistant United States Attorney James C. Delworth. Defendant Griggs was present and represented by his attorney, John D. Stobbs, II. At the hearing, the government presented the testimony of Special Agent ("SA") James Stroop, who has been employed with the Drug Enforcement Administration for two and one-half years. The witness was cross-examined extensively by defense

_____

motion. The Government responded to the request, stating it would disclose such information pursuant to Rule 16(a)(1)(G). The Order Concerning Pretrial Motions entered by the undersigned directed the Defendants to file discovery requests, and to file motions regarding any discovery disputes they were unable to resolve. Defendant Collins filed no such motion, and represented to the Court that argument was not necessary with regard to any of the discovery matters. As such, the undersigned assumes there is no dispute regarding this matter, and in any event, notes that it has no motion before it.

counsel. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witness, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In 2005, an investigation was begun regarding alleged drug trafficking by Sammy Jefferson and Eric Earnest, both of whom are named as co-Defendants in the instant indictment. The superseding indictment charges that beginning on or about December 2005 and continuing to the date of the indictment, in the City of St. Louis and elsewhere, Defendants Earnest, Jefferson, Griggs, Collins and others, engaged in a conspiracy to distribute and possess with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1). In connection with the drug trafficking conspiracy, the indictment alleges that unindicted co-conspirator Luis L. Sais, Jr., operating out of the Republic of Mexico, was the source of supply for multi-kilogram quantities of cocaine and large quantities of marijuana. Sais is also alleged to be the organizer and leader of a drug-trafficking organization, operating a large drug distribution network in a multi-state region that included the Eastern District of Missouri, and the indictment alleges that Sais utilized telephones to communicate with underlings and set up distribution hubs in various cities, including St. Louis, Missouri.

Per the indictment, co-Defendants Anthony Stiles, Jefferson and Earnest were the primary hub distributors in the St. Louis area, distributing multi-kilogram quantities of cocaine and marijuana. Defendants Griggs, Collins and others, as part of the conspiracy, were cocaine

distributors in the St. Louis area.  As part of the conspiracy, the Defendants allegedly utilized telephones to communicate, arrange and direct the shipment of multi-kilogram quantities of cocaine to cities, including St. Louis, to direct the distribution of the drugs, to direct the collection of money derived from the sale of the drugs, and to direct the shipment of millions of dollars to Texas and across the border into Mexico.

The indictment also alleges a money laundering conspiracy, involving Stiles, Earnest, Jefferson and others, but not including Griggs and Collins, to conduct financial transactions affecting interstate commerce, involving the transportation of the proceeds of the drug trafficking conspiracy, in the form of  currency, from St. Louis across state lines to Texas and elsewhere.

At the hearing on the motion to suppress electronic surveillance, the government presented two binders, Government Exhibit 1, which contain the relevant wiretap applications, authorizations, and reports.  Defendant Griggs raised no objections to the authenticity, foundation, and admissibility of the documents contained in the binders marked as Ex. 1, which were admitted into evidence.  Defendant Griggs's motion is limited to the issue of necessity under 18 U.S.C. § 2518(1)(c).  He contends that normal investigative procedures were sufficient to accomplish the purposes of the investigation such that the interception of electronic communications was unnecessary.  Defendant does not otherwise challenge the authorization to obtain the wiretaps or assert the absence of probable cause therefor.  As such, the Court will describe the wiretap applications and

orders in summary fashion and address in detail only those facts pertinent to Defendant's necessity argument.

In connection with their investigation, DEA Task Force Agent ("TFA") John Wallace filed an affidavit in support of an application for the interception of wire communications occurring over a cellular telephone, number (314) 565-8266 (target telephone #1), subscribed to by Earline Earnest and believed to be utilized by Eric Earnest. The application requested the interception of wire communications of Eric Earnest, Dionne Gatling, Sammy Jefferson, Vincent Pam, Lorenzo Gibbs, Pierre Starks, Royce Davenport, Kerri Locke, Antwain Elliott, Charles Howard, Chrystyl Hamilton, and an individual known only as "Death Row." At the hearing, "Death Row" was identified as the movant, Defendant Griggs. The application was properly authorized by the Attorney General's office. Govt. Ex. 1, Tab 1.

The application and affidavit established probable cause for the interception, and Defendant Griggs has not asserted otherwise. As such, the probable cause in support of the application will be summarized only briefly. As set forth in the affidavit, at the time of the first application, the agents were investigating a drug trafficking organization believed to be headed locally by Dionne Gatling. The organization was believed to have strong ties with the Black Mafia Family, a nationwide street gang entrenched in several cities, including Atlanta, Detroit, Houston and Los Angeles. The investigation showed the organization in St. Louis was engaged in trafficking in voluminous amounts of cocaine and, to a lesser degree, in marijuana. Dionne Gatling was an alleged associate, if

not member, of the Black Mafia Family drug trafficking organization (hereinafter, the "BMF Organization").  One cooperating source advised that between November of 2003 and February of 2005, that source alone purchased approximately 1,200 kilograms of cocaine from Dionne Gatling, at an estimated cost of $24 million.

The investigation showed Eric Earnest to be a close associate of Sammy Jefferson and Dionne Gatling.  Jefferson was supplied with cocaine by Gatling, and Earnest was supplied cocaine by Jefferson and perhaps also Gatling.  Both Earnest and Jefferson had strong ties to the BMF Organization.  The affidavit summarized information from three confidential sources, some of whom were admitted narcotics traffickers, whose information was corroborated and who were believed to be reliable based upon law enforcement actions and based on pen register and air time summary analyses of telephones in the instant investigation.  The information from one source was also confirmed through the use of consensually recorded telephone calls concerning a proposed drug transaction between that source and Dionne Gatling, in connection with an independent investigation.  One confidential informant advised that Earnest used the residence of Earnest's brother, identified only as "Death Row," as a safe house to secrete narcotics.  The residence was said to be located in the area of Interstate 270 and Lilac, in north St. Louis County.  The confidential informant had seen Earnest contact "Death Row" by telephone to arrange the delivery of narcotics to a particular place.  Govt. Ex. 1, Tab 2.

The affidavit of SA Wallach filed with the application detailed the participants'

use of cellular telephones in connection with their drug trafficking operation, including a large volume of cellular calls, shown through the use of pen registers. Gatling would apparently buy new Nextel Boost pre-paid telephones on a monthly basis in an effort to thwart law enforcement scrutiny, and would then discard the old telephones. He would only use the two-way features on the phones, and would use three to four different telephones at one time. The investigation also revealed that Gatling and his brother, Deron Gatling, possessed a high level of sophistication with respect to law enforcement techniques involving electronic surveillance. Consistent with their efforts to avoid detection, Gatling, Earnest, Jefferson and the other subjects took great care to limit access to the telephone numbers of their communication devices to other members of their organization, as evidenced by the fact that the confidential sources had limited knowledge of the telephone numbers being utilized by the subjects. With respect to the target telephone, the affidavit detailed certain transactions involving Eric Earnest in which the use of target telephone #1 was confirmed.

A review of the affidavit as a whole reveals the use of multiple confidential informants, consensually recorded telephone calls, the attempt to gain information from one or more individuals arrested following the observation of drug transactions, the use of law enforcement data bases, and the use of pen registers and trap and trace devices. Part X of the affidavit, beginning at page 50, and continuing through page 73, detailed the various other investigative procedures that had been used, the limitations or problems presented with each, as well as the limited information obtained from each.

For example, the affidavit described court ordered authorizations that had previously been obtained for the interception of wire communications in separate investigations in which Lorenzo Gibbs, Pierre Starks and Royce Davenport were intercepted conducting pertinent, narcotic related conversations. However, those conversations proved to have no value regarding the identity and roles of the members of the instant organization, its sources of supply, location of stash houses, or methods of transporting and distributing the drugs.

The affidavit also described physical surveillance that had begun in January 2006. While such surveillance had proven to be of some value, the attempts were limited because the targeted subject often became evasive and unusually cautious. Physical surveillance of the alleged coconspirators was also conducted, but had proven to be of little value. The investigators believed that prolonged or regular surveillance of the targets would most likely be noticed by them, causing the targets to become more cautious or flee, or would otherwise compromise the investigation. Physical surveillance had also proved inconclusive in establishing the roles of the named conspirators, identifying additional conspirators, or providing admissible evidence, because the subjects used counter-surveillance techniques. Further, the neighborhoods where the subjects were primarily located were not conducive to extensive physical surveillance. Paragraph 85 of the affidavit detailed several examples pertaining to attempts at physical surveillance.

The affidavit discussed that trash runs had been conducted, but had proven to be of

little value.  Trash runs were also likely to be of little use as several of the subjects lived in the City of St. Louis, where trash service was provided by large commercial-sized dumpsters.  The affidavit also related how a separate Title III investigation by members of the same investigative team had been compromised when a small child observed the investigators while conducting a trash run.

The affidavit also discussed the problems and limitations related to the use of mobile tracking devices, grand jury subpoenas, confidential informants, undercover agents, and search warrants, consensual searches and narcotic-related arrests.   Prior searches and arrests of individuals associated with the organization as well as interviews with subjects or associates were detailed.

Notwithstanding the use of multiple means of other investigative techniques spanning many months, the agent attested in paragraph 81of the affidavit that the investigative techniques failed to identify all significant members of the organization and the various co-conspirators involved in transporting, storing, and/or distributing the drugs. Further, very little information was gained regarding the money laundering operations or the identification of assets.

Based on this application, the Honorable E. Richard Webber, United States District Judge, Eastern District of Missouri, entered an Order on May 9, 2006, Case No. 4:06MC00268 ERW, authorizing the interception of wire communication occurring over target telephone #1, for a period of 30 days.  Id. at Tab 3.  The Order recited the following finding by Judge Webber with regard to other investigative techniques:

It has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.

Id. at Tab 3, p. 3.  With regard to its duration, the Order further provided:

"such interceptions shall not terminate automatically after the first interception that reveals the manner in which the alleged coconspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein [or for a period of thirty (30) days]."

Id. at Tab 3, p. 4.

Monitoring with respect to the first Order commenced on May 10, 2006.  Before the agents began monitoring, a minimization meeting was conducted and monitoring agents were instructed with regard to the minimization guidelines.  Id. at Tab 4.  During the course of the monitoring, the minimization procedures were observed, and 10-day reports were filed, demonstrating the minimization and detailing pertinent intercepted calls.  Id. at Tabs 5 - 7.

Through use of the wiretap, the investigators' knowledge of the organization began to increase.  As the investigation progressed, the investigators were able to identify additional persons involved in the drug trafficking operation.  As a result, subjects who had not previously been known or fully identified were later identified, as evidenced by the fact that their names appeared in later applications.

As set forth in the affidavit in support of the June 7, 2006 application (id. at Tab 9,

p. 13), on May 17, 2006, an Order authorizing the wiretap of telephone number (314) 853-4875 (target telephone #2), subscribed to and utilized by Dionne Gatling was issued by the Honorable Catherine D. Perry, United Stated District Court, Eastern District of Missouri.  Monitoring of that telephone began on May 18, 2006.

At some point after interceptions began on the first application, the timing of which is not clear, the investigators determined that it was appropriate to split the investigation.  One unit continued with the investigation of Gatling, while the other continued with the investigation of Jefferson and Earnest.

On June 7, 2006, the Honorable Stephen N. Limbaugh, United States District Judge, Eastern District of Missouri, entered an Order in Case No. 4:06MC00268 ERW, authorizing the continued interception of wire communications to and from target telephone #1.  Judge Limbaugh also authorized the initial interception of communications to telephone number (314) 920-2352 (target telephone #3) for a period of 30 days.  Id. at Tab 10.  Target telephone #3 was subscribed to by Antwain Elliott, and was believed to be utilized by Sammy Jefferson.  Id. at Tab 9.  The application was properly authorized by the Attorney General's office.  Id. at Tab 8.   More than ten additional subjects were listed in the application, including an individual known only as "Tez"; an individual known only as "Spence" (later identified as Spencer Mitchell); an individual known only as "Paula"; and Anthony Wilson.  "Death Row" continued to be listed as a subject, still known only by that name.

The affidavit of SA James Stroop was filed in support of the application.  In the

affidavit, SA Stroop summarized the information gained from the prior month's interceptions on target telephone #1. The calls monitored showed that Earnest and Jefferson were collaborating to obtain narcotics from a source previously unknown to the investigators, named Paula, who appeared to live in Miami. The telephone calls appeared to reflect representations by Paula that if Earnest could come down to Miami or travel out of the country with her, south of Miami, she could connect them with a source either in Miami or out of the country. Another series of intercepted calls revealed an individual named Tez, Taz, or Tad who wanted to obtain narcotics from Earnest. Suspicions regarding law enforcement were reflected by the fact that he stated that he did not want to talk on the telephone, and he represented that he had a safe place for them to conduct a transaction. Other calls reflected that Earnest and Jefferson were having difficulty making a delivery to someone called "Spence." Id. at Tab 9.

The affidavit further stated that through the calls intercepted on target telephone #1, the repeated use in those calls of Jefferson's nickname, and an analysis of toll information, the investigators were able positively to identify that Jefferson was the user of target telephone #3. A summary of some of the telephone calls demonstrated that Jefferson and his associates used target telephone #3 to promote the narcotics trafficking organization.

The affidavit also reflected the investigators' continued use of confidential informants and surveillance. In paragraph 47 of the affidavit, the SA Stroop attested to the fact that normal investigative procedures or techniques had failed to accomplish the

12

overall goals of the investigation.  At pages 45 - 62 of the affidavit, SA Stroop

summarized the other investigative means available, the degree to which they had been

employed, and the limited utility of those means.  For example, the intercepted calls

revealed more than one attempted transaction in which surveillance was initiated, but in

which the transaction was not completed for some reason.  SA Stroop further explained

why grand jury subpoenas were unlikely to be unproductive, further noting that the

confidential sources to the investigation had already provided the information they had,

and no further evidence would be obtained by requiring their appearance before a grand

jury.  While the investigators continued to use administrative subpoenas, which proved

useful in identifying the subscribers of a particular telephone, and to obtain air time

summaries, that information could not positively identify the actual users of the

telephones.  Moreover, some of the information obtained from subpoenas led to a

subsidiary telephone or paging service, or "reseller," and the investigators believed that

contact of these individuals by law enforcement could compromise the investigation.  An

instance in which a separate investigation by members of the same investigative team was

compromised after making such a contact was recounted.

The affidavit further explained why undercover operations had proven

unsuccessful, and noted that no undercover operative had been able to penetrate the

organization to the degree that the identity of all co-conspirators, the narcotics sources, or

the details of the financial operation could be learned.  While search warrants had

previously proved to be of some use, based on the collective experience of the

investigators, such piecemeal warrants normally fail to provide information regarding the entire organization, and search warrants focused on locations associated with the enterprise would likely compromise the investigation.  Id.  In his Order, Judge Limbaugh made a finding of necessity for the interception.  Id. at Tab 10,  p. 4.

As a result of this second Order, monitoring of target telephone #1 continued and monitoring of target telephone #3 began on June 7, 2007.  Ten-day reports of the monitoring were filed with the District Judge on June 20, June 28, and July 10, 2006.  Id. at Tabs 12, 13 and 14.

On July 10, 2006, Judge Webber entered an Order in Case No. 4:06MC00268 ERW, authorizing the continued interception with regard to target telephone #1 and target telephone #3.  The Order also covered the initial interception of wire communications to and from cellular telephone number (310) 357-8222 (target telephone #4), subscribed to by Sammy Johnson and believed to be utilized by Sammy Jefferson.  Id. at Tab 19.   The Order included a finding of necessity for the interceptions.  Id. at Tab 19, p. 5.  The application was properly authorized by the Attorney General.  Id. at Tab 17.

The list of suspects contained in the application was expanded from the prior list to include four additional suspects, whose full names were unknown, or who were known only by nicknames.  In addition, "Spence" was identified as Spencer Mitchell for the first time.  As set forth more fully in the affidavit, the application noted that on June 13, 2006, as a result of information obtained from the court-ordered wire interceptions, Mitchell was arrested with approximately 10 kilograms of cocaine.  Although being held on a

14

probation violation, the application noted that Mitchell had continued to be intercepted over the target telephones. Defendant Griggs was still known only as "Death Row," and continued to be identified as a subject only by his nickname. Id. at Tab 17.

The affidavit of SA Stroop was filed in support of the July 10, 2006 application. As detailed in the application, the calls intercepted as a result of the prior orders over target telephones #1, #3 and #4, established that Earnest, Jefferson, and others were actively involved in the large scale distribution of narcotics. For example, as a result of telephone calls intercepted between Jefferson, Earnest, and Spencer Mitchell, the agents learned of a planned purchase of 10 kilograms of cocaine on June 13, 2006. They were able to surveil the transaction and, as a result, Spencer Mitchell was arrested in possession of approximately 10 kilograms of cocaine that he received from Earnest and Jefferson. The interceptions also revealed a source of supply previously unknown to the investigators, known as Alex, who claimed to be in Mexico City, Mexico. This source directed Earnest to procure a T-Mobile telephone for future negotiations, and Alex provided a telephone number at which to re-contact him. Wire interceptions on the next day revealed that Earnest purchased a telephone which was subscribed to him in his own name. The interceptions also revealed that Sammy Jefferson at times carried a handgun, which he twice discarded or attempted to discard when he believed he might be detained by law enforcement officers. As a result, federal firearms statutes were added to the affidavit that were not included in previous applications. Id. at Tab 18.

SA Stroop's affidavit recited, at pages 56 - 80, the degree to which other

investigative techniques had been utilized, and why they had not proven sufficient to accomplish the goals of the investigation. The affidavit also detailed the manner in which the investigation had broadened as a result of the interceptions to date, but noted that some of the new subjects and their roles had yet to be identified. Moreover, the interceptions reflected important sources of supply yet to be identified, including the individual identified only as "Alex," from Mexico City. The monitoring of target telephone #2, which was utilized by Dionne Gatling, had not proven useful in the investigation. The authorization for the interception of telephone had since expired, and the investigators speculated that target telephone #2 was not a main telephone being used by Gatling.

The affidavit discussed the degree to which surveillance has been utilized, detailing several instances where surveillance has provided useful but incomplete information or had been unsuccessful. Updated information was provided with regard to several of the other investigative methods, such as confidential sources. With respect to the interview of subjects and associates, SA Stroop detailed the interview of Mitchell following his arrest. Mitchell advised that he was unaware of what the suitcase contained, and that he was merely transporting it to a spot in Illinois where another unknown subject would pick it up. He refused to identify Earnest or Jefferson. Id.

On August 8, 2006, Judge Limbaugh entered an Order in Case No. 4:06MC00268 ERW, authorizing the continued interception of wire communications occurring over target telephones #1 and #3, and the initial interception of wire communications

occurring over cellular telephone (314) 398-7692 (target telephone #5), for a period of thirty days.  Govt. Ex. 1, Tab 27.   Target telephone #5 was identified as a T-Mobile cellular telephone, believed to be utilized by Earnest and subscribed to by Sam Johnson. Id. at Tab 26.  Again, the list of targeted subjects was expanded, including the listing of an individual known as "Ivory," believed to be the coordinator for the Mexico City, Mexico, narcotics supply source.

    As set forth more fully in the affidavit of SA Stroop filed in support of the application, id. at Tab 26, after Earnest obtained the T-Mobile telephone as directed by Alex, the investigative team was unable to determine how the narcotic shipment was to take place.  Within days, however, interceptions over the existing wiretaps of target telephones #1 and #3 revealed that the St. Louis faction had been re-supplied with narcotics and were actively engaged in distributing them to co-conspirators in this area. Aggressive surveillance ensued, resulting in the arrest of Spencer Mitchell, discussed above.  Continuing interceptions revealed that Earnest had lost the T-Mobile telephone he had apparently utilized for the transaction with Alex.  After amassing currency from their sale of narcotics, Earnest discussed an upcoming shipment with the narcotics coordinator, Ivory, who repeatedly directed Earnest to acquire another telephone in order to speak directly to Alex.  Intercepted calls reveal that Earnest thereafter did acquire a new T-Mobile cellular telephone – target telephone #5 – which was the subject of the application.

    SA Stroop's affidavit again summarized information obtained from the

interceptions to date, including communications with a new subject, Heath, which led to surveillance of an apparent drug transaction and pictures of Heath. Communications with a new subject, Majuan Bates, were also discussed. The affidavit also detailed, at pages 56 - 75, the degree to which alternative investigative techniques had been utilized, and the limited usefulness of those techniques. Included were details of two unsuccessful attempts at surveillance. On July 14, 2006, Royce Davenport met with Sammy Jefferson pertaining to the collection of money, but surveillance had to be terminated when Davenport began to use counter-surveillance measures. The following day, agents made an attempt to surveil Sammy Jefferson when he met with Majuan Bates. However, that surveillance had to be terminated after Jefferson speeded up. That Jefferson had observed the surveillance was confirmed by the fact that one minute later, they intercepted a call from Jefferson to Earnest in which Jefferson advised him that he was being followed.

Ten-day reports were filed on August 18 and August 28, 2006, and the twelfth and final ten-day report was filed on September 7, 2006. Id. at Tabs 29, 30 and 33. From a review of the records, it appears that proper sealing orders were entered with regard to each of the applications and Orders, and Defendant asserts no argument with regard to the compliance with any other pre-authorization or post-authorization requirement.

**CONCLUSIONS OF LAW**

**I.  Motion to Suppress Electronic Surveillance
     filed by Defendant Gregory Griggs**

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§
2510 - 2520, regulates the interception of wire, oral, and electronic communications.  In
general, Title III prohibits the government from intercepting electronic communications
without first obtaining court authorization.  The statute permits such authorization only in
connection with the investigation of certain enumerated crimes, and sets out specific
procedures that must be followed.  In considering an application, the issuing court may
rely on the factual statements contained in the application and supporting affidavits.

As detailed in 18 U.S.C. § 2518(1), an application for a surveillance order must
include (a) the identity of the investigative officer making the application; (b) a full and
complete statement of the circumstances justifying the request, including (i) details as to
the particular offense, (ii) a description of the nature and location of the facilities to be
intercepted, (iii) details regarding the type of communication sought to be intercepted and
(iv) the identity of the person, if known, committing the offense and whose
communications are to be intercepted; (c) a full and complete statement regarding the
extent to which other investigative procedures had been tried or why they appear unlikely
to be productive; (d) a statement of the period of time for which the interception is to be
maintained; (e) a detailing of facts concerning all previous applications for wire
interceptions; and (f) where the application is for the extension of an order, a statement

19

setting forth the results thus far obtained. 18 U.S.C. § 2518(1)(a)-(f).

As set forth in 18 U.S.C. § 2518(3), the district judge may enter an order authorizing the interception if the judge determines that (a) there is probable cause to believe that an individual is committing, has committed, or is about to commit one of the enumerated offenses; (b) there is probable cause to believe that the particular communications concerning that offense will be obtained through the requested interception; (c) normal investigative procedures have been tried and failed or appear to be unlikely to succeed; and (d) there is probable cause to believe the facilities to be intercepted are being used, or about to be used, in connection with such offense, or are associated with or used by such person.

Affidavits in support of applications are judged by the same standards as used in connection with the issuance of conventional search warrants, and the probable cause standards set out in Title III are the same as the conventional requirements of the Fourth Amendment. United States v. Fairchild, 189 F.3d 769, 775 (8th Cir. 1999); United States v. Milton, 153 F.3d 891, 894 (8th Cir. 1998).

Defendant Griggs has not asserted that the applications and affidavits filed in connection with the Orders were not supported by probable cause. Based upon this Court's review of each of the applications and affidavits at issue, the Court in fact finds that there is overwhelming probable cause to believe that the named individuals were engaged in a substantial drug trafficking operation; that the communications concerning the offenses would be obtained through the requested interceptions; and that the facilities

to be intercepted were being used in connection with the offenses. Exhibit 1 filed by the Government also shows compliance with the other pre-authorization and post-authorization procedural requirements. Again, Defendant does not contend otherwise. Defendant's sole contention is that normal surveillance and investigative techniques were both possible and practicable, and that the necessity requirement was therefore not met.

With regard to the "necessity" requirement, section 2518(1)(c) requires that each application contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." The issuing court must likewise determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). The purpose of this requirement is "'to insure that wiretaps are not routinely employed as the initial step in an investigation.'" United States v. Maxwell, 25 F.3d 1389, 1394 (8th Cir. 1994) (quoting United States v. Macklin, 902 F.2d 1320, 1126 (8th Cir. 1990)). The case law recognizes, however, that "[e]ven if conventional techniques have been somewhat successful . . . a wiretap may still be authorized." Id. Moreover, the statute "'does not require that law enforcement officers exhaust all possible techniques before applying for a wiretap.'" United States v. Shaw, 94 F.3d 438, 441 (8th Cir. 1996) (quoting Macklin, 902 F.2d at 1326. As is often noted, "[t]he government is simply not required to use a wiretap only as a last resort." Macklin, 902 F.2d at 1327.

"'Whether the statutory requirement is met is to be determined by the issuing judge in a commonsense manner, and the determination is a finding of fact, which can be reversed only if clearly erroneous.'" Maxwell, 25 F.3d at 1394 (*quoting* Macklin, 902 F.2d at 1327). A party challenging the validity of a wiretap order must show a substantial deviation from the requirements of the statute, not merely a technical one. Fairchild, 189 F.3d at 774-75. "A wiretap authorization order is presumed valid, and the defendant bears the burden of proof to show otherwise." United States v. Radcliff, 331 F.3d 1153, 1160 (10th Cir. 2003).

In this instance, each of the issuing judges made the necessary findings of necessity in each of the Orders authorizing the interceptions and the continuation of those interceptions. From a review of all of the evidence, the Court finds that those determinations were well-supported.

The focus of the investigation was to determine the full extent of the conspiracy, including the identity and roles of the members of the instant organization, its sources of supply, the location of stash houses, the methods of transporting and distributing the drugs, and the sources or the details of the financial operation. The affidavits in support of each of the applications detailed the investigative procedures used to date, including past wiretaps related to individuals who appeared to have any historical connection to individuals involved in this drug trafficking operation. Each of the applications set forth in detail the investigators' efforts to use, and the limitations related to, each of the following alternative investigative methods: prior court-authorized Title-III monitoring;

physical surveillance; mobile tracking devices; trash runs; grand jury and administrative subpoenas; confidential informants and cooperating sources; undercover agents; search warrants, consensual searches and narcotic-related arrests; interviews of subjects or associates; pen registers and telephone records, including cellular air-time usage; police records; and financial investigations.

As set forth in the affidavits, a number of confidential informants had been used, and while their information had proven important, their information remained largely historical. Physical surveillance had also been employed over the course of several months, and while useful, the attempts were limited because the targeted subjects became evasive. Indeed, several specific instances where surveillance was detected by targeted subjects were detailed, as were specific instances in which surveillance had been attempted but been unsuccessful or thwarted. Moreover, the affiants explained that physical surveillance conducted of alleged conspirators had not proven that useful in achieving the overall objectives of the investigation, and was not likely to accomplish those objectives, while prolonged surveillance of the subjects would most likely be noticed and thereby compromise the investigation.

The problems associated with mobile tracking devices were discussed, and the agents demonstrated why the installation of such devices was unlikely to achieve the overall investigative objectives. Likewise, while the agents had used trash runs, they had proved to be of limited use. The affidavit also explained why trash runs were unlikely to

provide much of evidentiary value, and the risks associated with that means of investigation.

The investigators had used, and continued to use administrative subpoenas to identify subscribers of specific telephones, obtain telephone records, and obtain air-time summaries. While such documents were useful, they did not serve to identify the actual user of the phones or any specifics regarding the conversations. To the contrary, the information possessed prior to the first application suggested that the subjects were quite sophisticated in their use of telephones, and the wiretaps proved this information to be correct. The targeted subjects often used telephones registered in the names of others, repeatedly changed telephones, and used features such as push-to-talk to evade detection. The affidavits also demonstrated that further use of grand jury subpoenas was not likely to be useful, as the cooperating witnesses had already provided any information that they had. While attempts had been made to obtain the cooperation of others both before and after the commencement of the monitoring, those individuals – like Spencer Mitchell, for example – offered little if any cooperation. Likewise, search warrants and consensual searches had proven to be of limited value, and were unlikely to provide much assistance in achieving the overall investigative objectives.

At the hearing, Defendant Griggs specifically questioned the failure of the investigators to use trash runs with respect to him, and the failure to ask around the neighborhood to attempt to establish his identity. However, as set forth both in the affidavits and at the hearing, the investigators knew Defendant only by his nickname,

"Death Row," and did not know his exact address. They therefore could not have conducted trash runs related to him. And efforts to ask around about him in the neighborhood could have alerted Defendant to and compromised the investigation. Moreover, Defendant was not the only or even the main subject of the investigation; even if they had been successful in establishing Defendant's identity, that would not have accomplished much in terms of achieving the overall objectives of the investigation. Indeed, the necessity for the interceptions was borne out by the fact that both suppliers, other members of the conspiracy, and up-coming drug transactions were able to be identified only through the use of the telephone interceptions. As such, the failure more fully to employ these or other investigative means was reasonable and does not suggest a lack of necessity. *See* United States v. Jackson, 345 F.3d 638, 644-45 (8th Cir. 2003) (finding government adequately established need for a wiretap where the "focus of the application was upon the conspiracy itself, not merely those individuals who were involved"); *accord* United States v. McLee, 436 F.3d 751, 763 (7th Cir. 2006) (finding that although traditional techniques had met with some success, tapping defendants' telephones had become necessary because investigators had been unable, through the use of such techniques, to establish the identities of all participants in the conspiracy); United States v. Staves, 383 F.3d 977, 982 (9th Cir. 2004) (finding necessity requirement met where traditional techniques had not or were unlikely to uncover the full scope of the narcotics conspiracy).

For all of the foregoing reasons, the Court finds that there was a more than ample showing of necessity within the meaning of Title III.

## II.  Motion to Sever filed by Defendant Gregory Griggs

Defendant Griggs has filed a motion to sever, requesting that his case be tried separately from that of the co-Defendants.  "When a defendant moves for a severance, the [Court] must first determine whether joinder is proper under Federal Rules of Criminal Procedure 8.  If joinder is proper, the Court still has discretion to order a severance under Federal Rules of Criminal Procedure 14."  United States v. Darden, 70 F.3d 1507, 1526 (8th Cir. 1995).  These rules are to be liberally construed in favor of joinder.  Id.

Rule 8(b) provides that multiple defendants may be charged in the same indictment if it is alleged that they participated in the same act or transaction constituting an offense or offenses.  United States v. Bledsoe, 674 F.2d 647, 656-57 (8th Cir. 1982).  Joinder is clearly proper in this case, as the indictment alleges in Count I that all of the Defendants engaged in a conspiracy to distribute and possess with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

Rule 14, Fed. R. Crim. P., provides that a defendant's trial may be severed from the trial of co-defendants "[i]f it appears that a defendant or the government is prejudiced by a joinder."  "When joinder is proper under Rule 8, the defendant seeking a severance has the burden to demonstrate how the joint trial prejudiced his or her right to a fair trial."  Darden, 70 F.3d at 1527.  "There is a preference in the federal system for joint trial of defendants who are indicted together."  Zafiro v. United States, 506 U.S. 534, 537

(1993).  Severance is to be granted only if there is a "serious risk that a joint trial would compromise a specific trial right of a properly joined defendant or prevent the jury from making a reliable judgment about guilt or innocence."  Id. at 539. "Rarely, if ever, will it be improper for co-conspirators to be tried together."  United States v. Stephenson, 924 F.2d 753, 761 (8th Cir. 1991); United States v. Drew,  894 F.2d 965, 968 (8th Cir. 1990).  Further, "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."  Zafiro, 506 U.S. at 540; accord Layton v. South Dakota, 918 F.2d 739, 744 (8th Cir. 1991).

Severance is not to be granted merely because co-defendants have conflicting defenses.  Zafiro, 506 U.S. at 538; accord United States v. Garrett, 961 F.2d 743, 746 (8th Cir. 1992) (the fact that each defendant has his or her own personal interest at stake is not a sufficient ground to require separate trials).  Instead, the moving defendant must make a showing that a jury would be unable to compartmentalize evidence as it relates to each defendant.  Id.  Likewise, severance is not required if the evidence against a co-defendant is more damaging, United States v. Pou, 953 F.2d 363, 369 (8th Cir. 1992); if the defendant's role in the conspiracy is minor, United States v. Pecina, 956 F.2d 186, 188 (1992); or if all of the evidence will not be admissible against all co-defendants, United States v. Sparks, 949 F.2d 1023, 1027 (8th Cir. 1991).

Defendant Griggs asserts that severance is necessary to permit him to call co-Defendants Earnest and Sammy Jefferson, and other unspecified co-Defendants.  In conclusory language, Defendant asserts that these co-Defendants can offer exculpatory

evidence, but that he will be prevented from calling them as witnesses if the Defendants are tried together.  In order to support a request for severance on this ground, Defendant must show that 1) he would call a co-defendant as a witness at a separate trial; 2) the co-defendant would testify at this trial; and 3) the testimony of the co-defendant would be exculpatory.  United States v. Voss, 787 F.2d 393, 401 (8th Cir. 1986).  Defendant has not met his burden with respect to any of these requirements.  *See* Darden, 70 F.3d at 1527 (no abuse of discretion in denial of severance requested on grounds that movant was deprived of co-defendant's testimony, noting that the movant must show that the unavailable testimony would be substantially exculpatory); United States v. Oakie, 12 F.3d 1436, 1441 (8th Cir. 1993) (co-defendant's testimony must be "substantially exculpatory"; it is not enough that the testimony would "tend to contradict a few details of the government's case").  Furthermore, several of the Defendants in this case, including Sammy Jefferson, have already entered pleas of guilty, and change of plea hearings have been scheduled with regard to most of the remaining Defendants, including Eric Earnest.  As such, it may well be that Defendant Griggs will be the only Defendant, of those who have appeared, who will proceed to trial.

Defendant also asserts, without providing any details, his belief that certain statements and admissions inculpatory to him may have been made by co-Defendants, which statements would be admissible against the co-Defendants, but not against Defendant Griggs at a separate trial.  However, Defendant has identified no such statements.  Nor do Defendant's arguments regarding the statements of co-Defendants

28

provide a basis for severance under <u>Bruton v. United States</u>, 391 U.S. 123 (1968). Such statements by co-Defendants post-arrest, to the extent they exist, may be able to be redacted, consistent with <u>Richardson v. March</u>, 481 U.S. 200 (1987). Further, any statements of co-conspirators made during the course of the conspiracy would be admissible against Defendant, even in a separate trial, under FRE Rule 801(d)(2)(E). Finally, as set forth above, it is likely that by the time of trial most, if not all, of the other co-Defendants will have entered pleas.

For the above reasons, Defendant's motion to sever should be denied without prejudice to Defendant reasserting his request prior to trial if Defendant is able, at that time, to make the proper showing that any such co-Defendant would, indeed, offer substantially exculpatory testimony were Defendant to be tried separately.

### III. <u>Motion for Disclosure of Rule 404(b) and 609 Evidence filed by Defendants Griggs and Collins</u>

Defendants Griggs and Collins have filed motions for disclosure pursuant to Rules 404(b) and 609 of any "bad acts" or other criminal conduct that the government intends to introduce against them. Defendant Collins also request said information with regard to any co-Defendants or co-conspirators. In its response, the Government has asserted that it will turn over any 404(b) evidence, including prior convictions that it may seek to introduce under Rule 404(b), no later than two weeks prior to trial. The Government further states that it would use prior felony convictions for impeachment pursuant to Rule 609 if a Defendant elects to testify, and that such prior records are set forth in

Defendants' pre-trial services reports. To the extent that Defendant Collins is requesting

such information with respect to co-Defendants, the Court finds that the request exceeds

the requirements of Rule 16(a)(1)(D). As such, Defendants' motions for disclosure are

**Denied**.

### IV. <u>Motion for Disclosure of Impeaching Information<br>filed by Defendants Griggs and Collins</u>

Defendants Griggs and Collins have filed motions for the disclosure of any

impeaching information with regard to any witnesses. Included in the requirement to

produce favorable evidence mandated by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), is the

requirement to produce impeaching evidence. <u>United States v. Bagley</u>, 473 U.S. 667

(1985). The Government has stated that it is aware of its duty to disclose such

information pursuant to <u>Brady</u> and <u>United States v. Agurs</u>, 427 U.S. 97 (1976), and has

stated that it will provide any impeaching information that comes to its attention,

including any prior record of the witnesses, any plea agreements with the Government,

and any inconsistent statements, no later than the Friday before trial. The Government

has also stated that it will provide any witness statements, including grand jury testimony,

pursuant to the provisions of the Jencks Act, 18 U.S.C. § 3500. To the extent Defendant

seek other information, such as personnel files, or seek such information with regard to

persons who will not be called as witnesses, their requests go beyond what is required by

<u>Brady</u> and shall be denied at this time, absent a showing of further necessity by

Defendants.

## V. **Motion to Compel Disclosure of Favorable Evidence**
**filed by Defendant Collins**

Defendant Collins has filed a motion requiring the Government to disclose any favorable evidence, pursuant to <u>Brady</u> and related cases. The Government has responded that it is presently unaware of any such favorable evidence, but recognizes its continuing duty to disclose any such favorable evidence. Accordingly, Defendant's motion shall be denied as moot.

## VI. **Motion to Retain Agent's Rough Notes filed by Defendant Collins**

Defendant Collins has filed a motion to compel the Government to retain any agents' rough notes. With respect to the request to retain rough notes, the Eighth Circuit has indicated that it is a preferable practice that rough notes be retained, irrespective of whether they might be discoverable by the defendant. *See* <u>United States v. Leisure</u>, 844 F.2d 1347, 1361 n.10 (8th Cir. 1988); <u>United States v. Hoppe</u>, 645 F.2d 630, 634 n.2 (8th Cir. 1981). In its response, the Government has represented that it has informed the agents assigned to the case to preserve any existing notes. As such, Defendant's motion with regard to retaining rough notes will be denied, as moot.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the Motion to Suppress Electronic Evidence, filed by Defendant Gregory Griggs [Doc. No. 240] be **Denied**.

**IT IS FURTHER RECOMMENDED** that the Motion to Sever, filed by Defendant Gregory Griggs [Doc. No. 239] be **Denied**.

**IT IS HEREBY ORDERED** that the Motions for Disclosure of Rule 404(b) and 609 Evidence filed by Defendants Gregory Griggs and Brian Collins [Doc. Nos. 241 and 245, respectively] be **Denied**.

**IT IS FURTHER ORDERED** that the Motion for Disclosure of Impeaching Information, filed by Defendants Gregory Griggs and Brian Collins [Doc. Nos. 242 and 246, respectively] be **Denied**.

**IT IS FURTHER ORDERED** that the Motion for Disclosure of Favorable Evidence, filed by Defendant Brian Collins [Doc. No. 247] be **Denied, as moot.**

**IT IS FURTHER ORDERED** that the Motion for Government Agents to Retain Rough Notes, filed by Defendant Brian Collins [Doc. No. 249] be **Denied, as moot.**

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See* Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 15th day of October, 2007.